UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

STEPHEN DELIEFDE                                                    PLAINTIFF

V.                                    CIVIL ACTION NO. 3:19-CV-226-DPJ-FKB

ERIKA L. NIXON, ET AL.                                          DEFENDANTS

CONSOLIDATED WITH

ARNOLD OKECHUKWU                                                   PLAINTIFF

V.                                    CIVIL ACTION NO. 3:19-CV-229-DPJ-FKB

ERIKA L. NIXON, ET AL.                                          DEFENDANTS


ORDER

There are three pending motions in these consolidated personal-injury suits, all filed by

Defendant Greyhound Lines, Inc.  They are:  (1) a motion to dismiss Plaintiff Arnold

Okechukwu's claims for discovery violations, Mot. [85], in which Defendant Erika L. Nixon

joined, Joinder [87]; (2) a motion for summary judgment on all claims filed by Plaintiffs Stephen

Deliefde and Okechukwu, Mot. [90]; and (3) a motion to exclude testimony from Plaintiffs'

liability experts, Mot. [92].  For the following reasons, Greyhound's motion for sanctions [85] is

denied without prejudice; its summary-judgment motion [90] is granted in part and denied in

part; and its motion to exclude [92] is granted in part and otherwise denied without prejudice.

I.      Background

On January 2, 2019, Greyhound's driver, Nixon, was allegedly intoxicated and speeding

when she lost control of her bus in heavy rain while negotiating the Pascagoula Street entry ramp

to I-55 South in Jackson, Mississippi.  Plaintiffs Deliefde and Okechukwu were both passengers

on the bus and sustained injuries in the crash.  They sued Greyhound and Nixon in Hinds County

Circuit Court, alleging claims for negligence and gross negligence.  Greyhound removed the cases to this Court, and the Court consolidated them along with several that have now settled.

II.     Motion for Sanctions

Greyhound first seeks dismissal of Okechukwu's claims based on alleged perjury. "Courts possess the inherent authority to impose sanctions for misconduct and to protect the judicial process." *Snider v. L-3 Commc'ns Vertex Aerospace, L.L.C.*, 946 F.3d 660, 678 (5th Cir. 2019).  Dismissal with prejudice is within the Court's discretion, but it "is an extreme sanction that deprives a litigant of the opportunity to pursue his claim." *Id.* (quoting *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011)).  Thus, the ultimate sanction is appropriate "only if two conditions exist." *Id.*

> First, there must be "a clear record of delay or contumacious conduct by the plaintiff."  That is a factual finding that [the appeals court] review[s] for clear error.  Perjury is contumacious conduct that can satisfy the first condition. Second, dismissal is appropriate when "lesser sanctions would not serve the best interests of justice."  The district court should show on the record that it considered lesser sanctions.

*Id.* at 678–79 (quoting *Brown*, 664 F.3d at 77) (footnotes omitted).  Greyhound must make the first showing by clear and convincing evidence.  *See In re Moore*, 739 F.3d 724, 730 (5th Cir. 2014) ("[W]e uphold a lower court's decision to invoke its inherent sanctioning power only if clear and convincing evidence supports the court's finding of bad faith or willful abuse of the judicial process.").

Greyhound says dismissal is warranted because Okechukwu "submitted a fabricated offer letter, purportedly from a Nigerian professional basketball team, to support his exorbitant lost[-]future[-]wage claim[,] and repeatedly committed perjury during his depositions."  Def.'s Mem. [86] at 1.  Greyhound also claims that Okechukwu's stories about his work history and whether

he lost consciousness after the accident have evolved and demonstrate additional perjury; those issues will be addressed later.

Starting with the basketball offer, Okechukwu is from Nigeria. A 6'10" center, he moved to the United States during high school to play basketball. He began his college playing career at Adams State University, an NCAA Division II school. After one season, Okechukwu transferred to Paine College, another Division II school, where he played two seasons and exhausted his eligibility. Over his Division II career, he averaged just over two points and under three rebounds per contest.

At the conclusion of his college basketball career in 2016, Okechukwu allegedly had an offer to play professional basketball in Europe, but he turned it down to finish school and obtain his degree. Two years later, Okechukwu graduated from Paine, allegedly with plans for a professional basketball career. According to Greyhound, he gave conflicting statements about those plans to his medical providers after the wreck:

- In February 2019, Okechukwu told an orthopedist that he was "scheduled to play basketball overseas in April." Records [85-6] at 8.

- He told a psychiatrist on March 19, 2019, that "he had planned to play basketball in Europe beginning in May." *Id.* at 6.

- He told another provider in August 2019 that "he was planning to play basketball in Europe back in [M]arch." *Id.* at 12.

These minor inconsistencies aside, the biggest dispute relates to alleged plans to play professionally in Nigeria. According to Okechukwu, Peter Ahmedu, the president and coach of the Dodan Warriors basketball team based in Nigeria, "respected" that Okechukwu wanted to finish college "and kept checking in on [him]" in the two years after his college career ended. Okechukwu Dep. [98-10] at 19. Then, in October 2018, Okechukwu allegedly received a letter

from Ahmedu, offering a professional contract for the 2019 season.  Offer Letter [85-4].

Okechukwu says he verbally accepted the offer in a subsequent phone call with Ahmedu.

When Greyhound initially deposed Okechukwu in July 2020, he did not possess a copy

of the Warriors' offer letter.  But on September 16, 2020, Okechukwu produced an expert report

estimating that his lost wages related to the Warriors' offer totaled $1,996,123.  *See* Expert

Report [85-2] at 5.  The following day, Okechutwu produced the Warriors' offer letter to

Greyhound; it reflected an offer to play for the team from April through October 2019 for $1,600

(biweekly), plus use of an SUV and a place to stay.  *See* Letter [85-4].  The single-page letter

contains neither a return address for the Warriors nor Okechukwu's address as the addressee.

Greyhound was skeptical, so it began "to research the Dodan Warriors and their alleged

President, Peter Ahmedu."  Def.'s Mem. [86] at 8.  Greyhound claims that it ultimately tracked

down "the real owner and president of the Dodan Warriors Basketball Programme, Col. Sam

Ahmedu," Peter Ahmedu's brother.  *Id.*  Greyhound has submitted affidavits from the Ahmedu

brothers, in which they swear that:

- Although the letter identifies Peter as the team president, Sam was the president of the Dodan Warriors.  Sam Aff. [85-11] ¶ 3; Peter Aff. [85-12] at 6.

- Sam, not Peter, was "the signatory of all official letters on behalf of the Dodan Warriors, unless as designated by [him]."  Sam Aff. [85-11] ¶ 4.

- The offer letter Okechukwu produced "did not originate from the Dodan Warriors," and "Okechukwu was never made an offer to play basketball with the Dodan Warriors."  *Id.* ¶ 7.

- The alleged signatory, Peter, "did not have permission or authority to extend offers."  *Id.* ¶ 9.

- "The e-mail address identified at the end of the purported offer letter does not belong to the Dodan Warriors."  *Id.* ¶ 11.

- Peter says the signature on the offer letter is "not [his] signature."  Peter Aff. [85-12] ¶ 6.

4

- Peter is "the Assistant Coach of the Dodan Warriors Senior Team[ and] Head Coach of the Warriors Basketball Academy." Sam Aff. [85-11] ¶ 8. In his capacity as a coach, Peter "did not employ players or staff" and "did not have permission or authority to extend offers to play basketball on behalf of the Dodan Warriors." *Id.* ¶ 9; *accord* Peter Aff. [85-12] ¶ 4.

- Peter is "not familiar with . . . Okechukwu," is "not aware of any evaluation related to that individual," and says he "ha[s] never spoken on the telephone to" and "did not make a verbal offer to" Okechukwu. Peter Aff. [85-12] ¶¶ 8, 9.

- The Dodan Warriors "have never compensated [their] players" at the rate set forth in Okechukwu's offer letter. Sam Aff. [85-11] ¶ 10.

Greyhound says this evidence "conclusively proves that the offer letter produced by Plaintiff Okechukwu was fabricated to exaggerate Okechukwu's damages." Def.'s Mem. [86] at 9. Neither brother has been deposed.

Okechukwu counters with testimony from two people who say they learned in fall 2018—before the subject wreck—that Okechukwu had received an offer to play professional basketball in Nigeria. Specifically, a fellow Nigerian basketball player, Somto Ogukwe, testified that he was "personally aware that [Okechukwu] was made an offer to play professionally in Nigeria in the fall of 2018[,] and we discussed it prior to the bus wreck which was in January 2019." Ogukwe Aff. [98-7] ¶ 7. Similarly, Chase Campbell, Okechukwu's coach at Paine College, testified that "[i]n the fall of 2018, . . . Okechukwu called [him] and excitedly explained that he had received a professional basketball offer to play overseas in his home country of Nigeria." Campbell Aff. [98-6] ¶ 16.[1]

Greyhound addresses Okechukwu's evidence first by arguing that Ogukwe's and Campbell's statements contain inadmissible hearsay. But their declarations are not being

---

[1] Okechukwu also offers evidence that, contrary to his affidavit, Peter Ahmedu was involved in player development in 2018. That evidence is clearly hearsay, but Plaintiff also notes that this issue was raised after discovery ended, so the Ahmedus have never been deposed. Given the results of this motion, the Court need not consider this additional evidence.

considered for the truth of the matter asserted—that Okechukwu had an offer to play professional basketball in 2018.  They indicate instead that Okechukwu discussed those plans before the subject wreck, thus, before he would have had an incentive to augment his damages.  *See Anderson v. United States*, 417 U.S. 211, 220 n.8 (1974) ("[E]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement."); *see also* Fed. R. Evid. 801(d)(1)(B).  Accordingly, the Court is left with two stories—both supported by sworn testimony.

But even assuming Okechukwu was offered a roster spot in Nigeria before the wreck, it is still possible that the October 2018 Warriors' offer letter was fabricated.  Indeed, it appears likely that it was.  So, the question is whether Okechukwu fabricated it.  There are certainly inferences on that point, but there is no clear and convincing evidence that he did.  Perhaps someone fabricated the letter at some point, but Okechukwu told others he received an offer.  On this record, Greyhound has not met its burden.

Of course, Greyhound says this issue does not stand alone; it also disputes Okechukwu's evolving story regarding his work history and whether he lost consciousness in the accident.  To support those arguments, Greyhound offers the following:

- In February 2019, Okechukwu reported to a physical therapist that he was a "basketball player (and IT specialist)."  Medical Records [85-6] at 4.

- He told a psychiatrist in March 2019 "that he was working in the IT department of a local trucking company, but when he wanted to return to work after the accident, he found 'they had replaced [him.]'"  *Id.* at 6.

- Okechukwu denied loss of consciousness to the paramedics who drove him to the hospital on the night of the accident.  *Id.* at 1.

- He continued to deny a loss of consciousness at the emergency room that evening.  *Id.* at 2, 3.

- At a January 23, 2019, appointment with a neurosurgeon, Okechukwu "noted a brief loss of consciousness." *Id.* at 5.

- Okechukwu subsequently made similar reports to additional medical providers. *Id.* at 7 ("[Okechukwu] reports that he briefly lost consciousness."), 9 ("[H]e passed out for 20–30 seconds."), 10 ("He briefly lost consciousness."), 11 ("Concussion with loss of consciousness of 30 minutes or less."), 12 ("Diffuse traumatic brain injury with loss of consciousness of 30 minutes or less.").

These statements differ in some respects from the testimony Okechukwu provided in discovery. As for his employment history, Okechukwu explained in discovery that he worked as a student technician in Paine College's IT Department before his graduation, and he interned at a trucking company in 2018 before his graduation, performing IT duties. As for the loss of consciousness, Okechukwu testified that he lost consciousness in the accident for "[a] good 20 seconds to a minute." Okechukwu Dep. [98-8] at 62.

Greyhound says the inconsistencies between these sworn statements and his out-of-court comments demonstrate perjury. But that is not apparent. "A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Starting with the employment issues, Okechukwu's sworn statements are not entirely inconsistent with the more general statements he made to the providers; one would normally expect statements made under threat of perjury to be more precise. Moreover, what he said under oath about his employment—that he was not working when the accident happened—seems less favorable to his claim and therefore less likely to be the result of perjury. For all the Court knows, the sworn statements were true, and the out-of-court comments were inaccurate.

The consciousness issue is different: Okechukwu's statements the night of the accident suggest he never lost consciousness, whereas his subsequent statements say he did. There is

evidence that Okechukwu suffered a brain injury that night, though the parties dispute its extent. Regardless, inconsistencies of this degree are commonplace and insufficient to warrant dismissal. Instead, they will be subject to vigorous cross examination at trial. *See United States v. St. Junius*, 739 F.3d 193, 202 (5th Cir. 2013) ("Evidence of a witness'[s] prior inconsistent statements may be admitted to impeach that witness."); *see also* Fed. R. Evid. 613.

Taking the alleged misconduct together, Greyhound has not demonstrated that this case should be dismissed or subject to lesser sanctions. It warrants emphasis that the standard for dismissing a case is high, and Greyhound has not proven contumacious conduct by clear and convincing evidence. *See Snider*, 946 F.3d at 678 (explaining that whether a defendant has shown "a clear record of delay or contumacious conduct by the plaintiff . . . is a factual finding" for the district court) (quoting *Brown*, 664 F.3d at 77).[2]

III.    Motion for Summary Judgment

Because it admits vicarious liability for Nixon's simple negligence, Greyhound seeks summary judgment on the remaining claims against it.

A.    Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

---

[2] That said, this is a close call. Greyhound may not have met the burden to impose sanctions, but it has presented strong evidence that something is amiss. And, while this looks like a jury question at this point, things might look different after the Court hears the live, sworn testimony at trial and can evaluate the witnesses' credibility. Accordingly, the motion is dismissed without prejudice to reasserting it at the close of evidence. Finally, the Court reminds all parties that perjury is a criminal offense. *See* 18 U.S.C. §§ 1621, 1623.

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

B.      Analysis

On the final day of the discovery period, Greyhound supplemented its discovery responses and included the following admissions:

> Greyhound admits, acknowledges, and stipulates that Erika Nixon's simple, ordinary negligence was the proximate cause of the subject accident.  Greyhound further admits, acknowledges, and stipulates that because Erika Nixon was acting within the course and scope of her employment with Greyhound at the time of the subject accident Greyhound is vicariously liable for the simple, ordinary negligence of Erika Nixon.

Def.'s Supp. Resps. [92-10] at 8.  Based on those concessions, Greyhound now seeks summary judgment on Plaintiffs' direct, simple-negligence claims, and it says Plaintiffs have come

9

forward with no facts to support a direct, gross-negligence claim against the company.  As such, Greyhound also contends that there is no basis to award punitive damages.

       1.      Direct, Simple-Negligence Claims Against Greyhound

Plaintiffs allege both vicarious and direct simple-negligence claims against Greyhound. The latter are based on theories of negligent training, negligent supervision, negligent entrustment of the bus to Nixon, and negligence per se.  Greyhound argues that those direct-liability claims must now be dismissed because it has conceded that Nixon's simple negligence occurred within the course and scope of her employment and proximately caused the crash, thus admitting its vicarious liability.

Since 1983, federal district courts in Mississippi have consistently made an *Erie* guess[3] that "the Supreme Court of Mississippi would approve the dismissal of a claim of negligent entrustment against an employer who has already confessed liability for its employee's conduct under the theory of respondeat superior."  *Walker v. Smitty's Supply, Inc.*, No. 5:06-CV-30-DCB-JMR, 2008 WL 2487793, at *5 (S.D. Miss May 8, 2008); *see Cole v. Alton*, 567 F. Supp. 1084 (N.D. Miss. 1983) (first making that *Erie* prediction); *Gaddis v. Hegler*, No. 3:10-CV-249-CWR-LRA, 2011 WL 2111801, at *3 (S.D. Miss. May 26, 2011) (explaining that federal courts in Mississippi have applied the rule to "negligent entrustment and related claims" and collecting cases); *Harris v. MVT Servs., Inc.*, No. 1:06-CV-251-LG-RHW, 2007 WL 2609780, at *1 (S.D. Miss. Sept. 7, 2007) (applying rule to negligence per se claims).  These cases represent the

---

[3] *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) (explaining how courts make an *Erie* guess as to content of state law where the state supreme court has not ruled on an issue).

majority view in other jurisdictions as well.  *See Welch v. Loftus*, 776 F. Supp. 2d 222, 225 (S.D. Miss. 2011).

The *Erie* guess made by these federal courts is consistent with an analogous opinion from the Mississippi Supreme Court and a non-binding opinion from the Mississippi Court of Appeals.  In *Nehi Bottling Co. of Ellisville v. Jefferson*, the employer admitted vicarious liability, and the court held that it was therefore error to admit evidence of the employee driver's prior accidents.  84 So. 2d 684, 687 (Miss. 1956).  In *Carothers v. City of Water Valley*, the Mississippi Court of Appeals directly considered the issue and followed the federal courts.  242 So. 3d 138, 144 (Miss. Ct. App. 2017) (Griffis, J.), *cert. denied*, 246 So. 3d 67 (Miss. 2018).  Writing for the court, now Mississippi Supreme Court Justice Kenny Griffis held, "The City admitted vicarious liability.  Thus, there was no need to show that it was negligent in hiring, training, retaining, or entrusting Officer Jackson."  *Id.* (affirming dismissal under Rule 12(b)(6)).  Notably, the Mississippi Supreme Court denied certiorari.  246 So. 3d 67.

"The reasoning underlying these cases is that once an employer has admitted that it is liable for an employee's actions, evidence pertaining only to issues of negligent hiring, entrustment, supervision, or maintenance becomes superfluous and possibly unfairly prejudicial."  *Roberts v. Ecuanic Exp., Inc.*, No. 2:12-CV-84-KS-MTP, 2012 WL 3052838, at *2 (S.D. Miss. July 25, 2012).

Plaintiffs acknowledge this authority but offer a few reasons to reject it.  First, they claim that as "a carrier of passengers for hire," Greyhound must "exercise the highest degree of care and diligence for the safety of its passengers."  Pls.' Mem. [102] at 18 (quoting *Goodwin v. Gulf Transp. Co.*, 453 So. 2d 1035, 1036 (Miss. 1984)).  Even if true, Greyhound admitted Nixon's proximate fault under ordinary care; ergo, she likewise failed to adhere to heightened standards.

Plaintiffs next argue that "dismissing the negligence claims no longer makes sense in jurisdictions adopting any form of comparative fault" because "accident victims must be permitted to present evidence of any and all proximate cause[s] of their injuries, including that of the truck company's direct negligence." Pls.' Mem. [102] at 24; *see Gordon v. Great W. Cas. Co.*, No. 2:18-CV-967, 2020 WL 3472634, at *4 (W.D. La. June 25, 2020) ("Where an employer's potential fault is merged with that of the employee, the jury might not have a true picture of either party's wrongful acts—which may, in turn, magnify the comparative fault of the plaintiff or other individuals.").

Although Greyhound initially asserted comparative fault in its Seventh Affirmative Defense, it subsequently stipulated that Nixon's negligence "was the proximate cause of the subject accident" when asked to identify "anyone else" whose acts "constitute a proximate cause of the incident." Def.'s Supp. Resps. [92-10] at 8. And because Greyhound accepted vicarious liability, Plaintiffs are entitled to fully recover for their compensable injuries.

Next, Plaintiff directs the Court to the following comment from the Restatement (Second) of Agency:

> In addition to liability under the [negligent entrustment or supervision] rule stated in this Section, a master may also be subject to liability if the act occurs within the scope of employment. In a given case the employer may be liable both on the ground that he was personally negligent and on the ground that the conduct was within the scope of employment.

Restatement (Second) of Agency § 213 cmt. h (citation omitted) (cited in Pls.' Mem. [102] at 24). While the Mississippi Supreme Court has "expressly quoted and adopted the principles of . . . § 213," it has cited only the general negligent-entrustment-or-supervision rule of liability set forth in that section. *Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008) (citing *Tillman ex rel. Migues v. Singletary*, 865 So. 2d 350, 353 (Miss. 2003)). The Mississippi Supreme Court has never relied upon or applied the rule expressed in comment h, and that rule conflicts with the

12

Mississippi Court of Appeals opinion in *Carothers* and the consensus among federal district courts in Mississippi following *Cole*.

Finally, Plaintiffs say they never accepted Greyhound's stipulations of vicarious liability and Nixon's negligence. But they point to no authority suggesting that they must acquiesce in Greyhound's acceptance of partial liability. In *Stokes v. Captain D's, LLC*, Judge Aycock considered a motion in limine in which the plaintiff asked that the defendants "be precluded from referencing attempts to stipulate to liability." No. 1:16-CV-152-SA-DAS, 2018 WL 1621042, at *3 (N.D. Miss. Apr. 4, 2018). Judge Aycock denied the plaintiff's "attempt[] to reject the [d]efendants' admission [of liability]." *Id.* at *4. The Court agrees with Judge Aycock's approach; Plaintiffs need not agree to Greyhound's admission of liability.

As a final note, Plaintiffs are not entitled to double recovery, so they could not recover separate damages for Greyhound's vicarious liability and its direct fault (if any). Thus, allowing "[p]roof of negligent entrustment or the like . . . is unnecessary and duplicitous at best, and at worst could provide unduly prejudicial evidence that is ultimately irrelevant." *Welch*, 776 F. Supp. 2d at 225; *see also Cole*, 567 F. Supp. at 1085 (noting practical effect of allowing plaintiff to proceed on negligent entrustment after admitting vicarious liability "would be to allow plaintiffs to introduce at trial evidence of the driver's prior traffic violations, otherwise inadmissible under [Rule] 404(b)"). Greyhound is entitled to summary judgment on the direct, simple-negligence claims.

### 2. Gross-Negligence Claims and Punitive Damages

A claim for punitive damages will lie only where the plaintiff shows, by clear and convincing evidence, that the defendant acted with "actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual

13

fraud." Miss. Code Ann. § 11-1-65(1)(a). Plaintiffs aver that Greyhound was grossly negligent, thus entitling them to punitive damages.

Greyhound says the Court should grant partial summary judgment on gross-negligence/punitive damages for four primary reasons: (1) the gross-negligence claims were insufficiently pleaded; (2) admitting vicarious fault eliminates the gross-negligence claims; (3) there is no vicarious liability for gross negligence; and (4) Plaintiffs failed to prove gross negligence by clear and convincing evidence.

a.      Whether Plaintiffs Properly Pleaded Gross Negligence

Greyhound claims that "Plaintiffs failed to identify any grossly negligent conduct attributable to Greyhound" in their complaints and that their "allegations of gross negligence attributable to Greyhound do not meet the pleading requirements under *Iqbal* and *Twombly*." Def.'s Mem. [91] at 7 (citing *Evans v. Roger's Trucking, Inc.*, No. 3:10-CV-157-DCB-JCG, 2019 WL 5295198, at *2 (S.D. Miss. Oct. 18, 2019)).

Maybe, but even if the complaints were insufficient, it is unclear why those initial pleadings now matter. For starters, Greyhound knew Plaintiffs made conclusory assertions of gross negligence in their complaints yet never filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or Rule 12(c). *See* Mot. [90] (citing Fed. R. Civ. P. 56).

Had it done so, and had the Court concluded that the claims were insufficiently pleaded, the Court would have allowed Plaintiffs to seek leave to amend. *See Dierlam v. Trump*, 977 F.3d 471, 478 n.44 (5th Cir. 2020) ("While a court can dismiss a deficient pleading, it should provide '*at least* one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that . . . the plaintiffs advise the court that they are unwilling or unable to amend in a manner that

will avoid dismissal.'" (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313

F.3d 305, 329 (5th Cir. 2002)) (emphasis added by *Dierlam*).

Regardless, Plaintiffs have now provided factual particulars—and record evidence—to

support their claims that Greyhound acted with gross negligence.  So, even if the Court construes

Greyhound's present motion as alternatively seeking dismissal under Rule 12(c), something

Greyhound does not mention, it would convert the motion under Rule 12(d) and consider

Plaintiffs' evidence.  The Court's ruling on this motion is not limited to the bare allegations of

the two complaints.

> b.   Whether Admitting Vicarious Liability Eliminates the Gross
>        Negligence Claims

Greyhound hopes that by admitting vicarious liability for Nixon's simple negligence, it

will avoid punitive damages.  As it described the argument in its reply, "[b]ecause Plaintiffs

cannot maintain a compensatory claim against Greyhound, they cannot maintain a punitive[-]

damages claim against Greyhound."  Def.'s Reply [109] at 2 (quoting *Clark v. Lard Oil Co.,

Inc.*, No. 2:18-CV-00109-KS-MTP, 2019 WL 5802379, at *7 (S.D. Miss. Sept. 6, 2019)).

Greyhound builds that argument from Judge Starrett's observation in *Clark* that

"[p]unitive damages do not exist in a vacuum.  Absent a valid claim for compensatory damages,

there can be no claim for punitive damages."  *Id.* (citing *Clark*, 2019 WL 5802379, at *7).  But

context matters.  In *Clark*, Judge Starrett dismissed the simple negligence claims for negligent

hiring, training, and entrustment after the employer admitted vicarious liability.  *Id.* at *4.  And

the court did hold that a direct claim against the defendant would be required for punitive

damages, as "no punitive damages [are] allowed on a vicarious liability theory."  *Id.* at *4–5, *5

n.9.  But Judge Starrett also assumed that the plaintiff had separately pleaded a claim for gross

15

negligence, noting that, if proven, *that* claim would support punitive damages. *Id.* at *6–7 (granting summary judgment because plaintiff offered no evidence of gross negligence).

Judge Starrett took the same approach in *Roberts v. Ecuanic Express, Inc.*, where he more directly observed: "This Court has previously implied—if not explicitly held—that a plaintiff's independent claims for punitive damages against an employer may proceed despite the employer's admission that its employee was acting in the course and scope of employment." No. 2:12-CV-84-KS-MTP, 2012 WL 3052838, at *2 (S.D. Miss. July 25, 2012) (collecting cases). This Court agrees with that assessment; Greyhound cannot avoid punitive damages by admitting only vicarious liability for Nixon's simple negligence.

c.      Whether Greyhound Is Vicariously Liable for Punitive Damages

Greyhound finds firmer footing when it says there is no vicarious liability for punitive damages. Plaintiffs do not address this argument, which appears legally correct. *See Lee v. Harold David Story, Inc.*, No. 3:09-CV-696-TSL-MTP, 2011 WL 3047500, at *2 (S.D. Miss. July 25, 2011) (finding that employer "cannot be vicariously liable for punitive damages on account of [employee's] gross negligence"). Accordingly, summary judgment is granted to the extent Plaintiffs pleaded a vicarious claim for punitive damages

d.      Whether Plaintiffs Have Offered Proof of Gross Negligence

The real question is whether Plaintiffs' evidence creates a question of fact regarding gross negligence, which they must show in this case to obtain punitive damages. But first, there's a procedural wrinkle. Under section 11-1-65, the liability and punitive-damages phases must be bifurcated:

> (b)  In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages.

(c)  If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact.

Miss. Code Ann. § 11-1-65(1)(b)–(c).

Assuming the Court can address punitive damages under Rule 56, it is important to note that the standards are different under Rule 56 than they would be after the liability phase.  Under section 11-1-65(1)(c), "the trial court is the gatekeeper for the issue of whether punitive damages . . . should be submitted and considered by a jury."  *Doe v. Salvation Army*, 835 So. 2d 76, 78–79 (Miss. 2003).  When making that ruling after the liability phase, "the trial court decides whether, under the *totality of the circumstances* and *viewing the defendant's conduct in the aggregate*, a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard."  *Id.* (emphasis added) (citing *Ross-King-Walker, Inc. v. Henson*, 672 So. 2d 1188, 1191 (Miss. 1996)).  Thus, the Court must weigh the evidence when performing its gatekeeping function.  *Id.*

Rule 56 is different.  Under that rule, summary judgment is warranted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making that determination, the Court may "not make credibility determinations or weigh the evidence."  *Reeves*, 530 U.S. at 150.  And it must "view the evidence 'in the light most favorable to the opposing party.'"  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

This Court has previously noted this distinction.  *See, e.g.*, *Noel v. Wal-Mart Stores, Inc.*, No. 3:17-CV-203-DPJ-FKB, 2018 WL 1440538, at *4 (S.D. Miss. Mar. 22, 2018) (holding that Rule 56 standards apply to 11-1-65(1)(c) inquiry before trial).  Other courts have done likewise. *See Welch*, 776 F. Supp. 2d at 227 (denying partial summary judgment on punitive damages and noting that evidence must be viewed in light most favorable to nonmovant); *Evans v. Hayes*, No.

2:05-CV-379-KSM-TP, 2006 WL 2975473, at *4 (S.D. Miss. Oct. 17, 2006) (denying partial summary judgment due to factual disputes and reserving issue until after liability phase).

Here, Plaintiffs' gross-negligence claims survive Greyhound's Rule 56 motion when the facts are viewed in the light most favorable to them.  Primarily, Plaintiffs say Greyhound (1) never received Nixon's valid employment history, (2) instructed Nixon not to take a blood-alcohol test after a 2016 accident, (3) allowed Nixon to drive despite two other wrecks, safety issues, and other poor performance, (4) failed to provide an on-site supervisor at the Jackson terminal the night of the crash, (5) had actual knowledge of Nixon's drinking problems, and (6) never obtained a valid drug or alcohol test for Nixon during her nearly four years of employment with the company.

There is evidence to weigh against all this, and the Court recognizes the steep burden Plaintiffs face under section 11-1-65.  But on this record, under the Rule 56 standard, summary judgment is not warranted.  Finally, "the denial of summary judgment on the issue of punitive damages does not foreclose the possibility that the Court might ultimately refuse to submit the question to the jury." *Welch*, 776 F. Supp. 2d at 227.

For these reasons, Greyhound's summary-judgment motion is granted as to the direct, simple-negligence claims against it but is denied as to gross negligence and punitive damages.

IV.   *Daubert* Motion

Greyhound seeks to exclude Plaintiffs' liability experts Thomas Pittman (toxicologist), Kevin Bundy (accident reconstructionist), and Roger Allen (industry expert).  Greyhound's motion invokes the Court's gatekeeper function under Federal Rule of Evidence 702.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7 (1993).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as

> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702.

Whether a proposed expert should be permitted to testify under Rule 702 "is case, and

fact, specific." *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) (citation

omitted). Moreover, the district court retains "'broad latitude' both in deciding how to determine

whether an expert's testimony is reliable, and ultimately, whether the testimony is, in fact,

reliable." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999)).

"A party seeking to introduce expert testimony must show '(1) the testimony is based

upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods,

and (3) the witness has applied the principles and methods reliably to the facts of the case.'"

*Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (quoting Fed. R. Evid.

702). A court should "make certain that an expert, whether basing testimony upon professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. "The

party offering the expert must prove by a preponderance of the evidence that the proffered

testimony satisfies the rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir.

2002).

This gatekeeper function does not, however, replace a trial on the merits. "Vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence."

*Daubert*, 509 U.S. at 596.  With these standards in mind, the Court turns to Plaintiffs' three liability experts.

A.     Dr. Thomas Pittman

Dr. Thomas Pittman is a forensic toxicologist who offers opinions based on the .15% blood-alcohol concentration (BAC) that Nixon registered at the scene of the accident.  His opinions include:  (1) Nixon likely consumed five to six glasses of wine before driving the Greyhound bus that night, (2) Nixon was so impaired by alcohol "as to be incapable of safely operating a motor vehicle of any description," and (3) based on her BAC, "[d]uring the time she was at the terminal waiting to leave, [Nixon] would be exhibiting the classical signs of intoxication or impairment, such as slurred speech, glassy eyes, [and] unsteady gate [sic]." Pittman Report [103-1] at 5.

Greyhound takes no issue with Pittman's expertise or his methodology.  Instead, Greyhound tracks its summary-judgment motion and argues that there should be no evidence related to the cause of the accident because Greyhound has admitted vicarious liability. Greyhound also says that it "does not dispute Nixon's post-crash alcohol results obtained by the Jackson Police Department so Plaintiffs' Toxicologist's opinions and testimony are irrelevant, cumulative, and will not assist the trier of fact."  Def.'s Mem. [93] at 2.

Starting with the first two opinions regarding the amount of alcohol Nixon consumed and its impact on her driving, that evidence completes the story but is not overly probative as to Greyhound during the compensatory-damages phase of the trial.  But, as noted above, the Court denied Greyhound's summary-judgment motion on the gross-negligence claims, and the testimony would be more relevant if those claims reach the jury.

Even during the liability phase, the opinions remain relevant as to Nixon.  Unlike Greyhound, Nixon has not admitted fault, and she purportedly told Jackson Police Department officers that she consumed just "(2) shots of wine."  JPD Records [103-2] at 3.  Greyhound says this is of no moment because Plaintiffs can merely cross examine Nixon at the appropriate time. But if she stands by that statement and continues to deny fault, the expert testimony is squarely relevant for impeachment, and Plaintiffs are entitled to use it.

Greyhound alternatively says the evidence would be cumulative, prejudicial, and confusing under Federal Rule of Evidence 403.  First, there is nothing confusing about it. Second, the first two opinions are not, at this point, cumulative.  While Greyhound may have admitted the test results, it has not admitted how much Nixon consumed or how it affected her; Nixon has admitted nothing.  Third, while there may be some prejudice to Greyhound, the evidence is probative and that probative value is not substantially outweighed by the risk of "unfair prejudice" or any other Rule 403 concern as long as Nixon contests liability.  Fed. R. Evid. 403.

Greyhound's final argument for excluding the first two opinions is that they will not assist the trier of facts.  Here again, Greyhound says that it has admitted vicarious liability so the evidence would not be helpful.  As noted above, that argument may be true as to Greyhound but not Nixon.  To the extent Greyhound may suggest that expert testimony is not needed for issues regarding impairment, it is probably true that most jurors know alcohol impairs driving; a point that reduces the asserted unfair prejudice.  But Pittman's more precise opinions on this subject, and the amount of alcohol it would take to reach Nixon's BAC, fall beyond the common understanding of lay persons and therefore may "assist the trier of fact to understand the evidence."  Fed. R. Evid. 702; *see Huffman v. Union Pac. R.R.*, 675 F.3d 412, 419 (5th Cir.

2012) ("[J]urors are generally entitled to draw their own inferences from the evidence . . . , [but] when conclusions as to the evidence cannot be reached based on the everyday experiences of jurors, . . . expert testimony [is] necessary to evaluate the issue."). For these reasons, the Court will not strike Pittman's first two opinions.[4]

Pittman's third opinion, regarding how the consumption may have affected Nixon's behavior at the station, is a little different. As to it, Greyhound argues that the opinion "is not necessary because there are multiple people's testimony [sic] regarding Nixon's behavior the night of the accident." Def.'s Reply [108] at 3; *see also id.* ("It is therefore cumulative and unnecessary to have an expert testify as to how a person *could* be behaving when we have testimony from multiple persons as to how Nixon was *actually* behaving the night of the accident.").

Plaintiffs say in response that this testimony relates to "a very important issue[,] . . . whether Greyhound knew, or should have known, that Erika Nixon was intoxicated before operating the bus on January 2, 2019." Pls.' Resp. [104] at 6. That issue could reach the jury if the Court allows the case to proceed on punitive damages, but it will not be an issue during the liability phase, so the motion is granted as to the first phase of the trial.

After that, it is conceivable that the opinions would be relevant and assist the Court under section 11-1-65(1)(c) and the jury (if allowed to hear the punitive case). On the other hand, the opinions about how Nixon might have acted could be cumulative and unhelpful if witnesses

---

[4] This is admittedly an odd case. Plaintiffs are now entitled to receive 100% of their allowable compensatory damages from Greyhound, but Greyhound's employee appears to still contest liability. Thus, evidence that might not be admitted in a case against Greyhound alone would be admissible against Nixon. All of this might change as the trial approaches and Nixon's position becomes clearer. Moreover, the Court will discuss the practical implications of the current posture during the pre-trial conference. Accordingly, Greyhound's motion is denied without prejudice.

testify as to Nixon's actual behavior that night.  At this point, the Court has not heard these

witnesses.  Accordingly, the Court denies the motion without prejudice and will allow the parties

to address this issue after the liability phase.

B.     Kevin Bundy

Kevin Bundy is an accident reconstruction expert.  Bundy provides a summary of the

evidence, including deposition testimony, and describes how the accident took place.  He then

offers nine formal opinions.  Opinions seven and nine generally summarize the others.  Opinion

seven states:

> It is my opinion that his wreck happened because Ms. Nixon was driving too fast
> for the conditions, failed to maintain control of her vehicle, and failed to keep
> proper lookout.  Ms. Nixon was driving more than 15mph over the posted speed
> limit at night in the rain.  The wiper blades were not seen crossing the windshield
> in the dashcam video.  As the bus approached the ramp, Ms. Nixon failed to slow
> the bus, and failed to attempt to turn with the curve, causing the bus to exit the
> roadway.  The bus left the roadway and traveled onto a downhill slope as Ms.
> Nixon turned the steering wheel to the right.  The bus turning to the right on the
> slope caused the bus to roll onto the driver's side (left side) of the bus.  The bus
> slid on the ground several [sic] until coming to a stop.  Ms. Nixon misjudged the
> ramp and the curve.

Bundy Report [103-3] at 10–11.  Opinion nine states:

> Based on above, the actions and/or inactions of Erika Nixon and her employer
> Greyhound constitute negligence and violate Greyhound's policies, state law, and
> the Federal Motor Carrier Safety Regulations and this caused the subject wreck.
> Further, due to her impairment from alcohol, her excessive speed, the adverse
> weather conditions, and the fact that common carriers such as Greyhound owe the
> highest duty of care for the safety of their passengers, the Defendants were
> grossly negligent and/or reckless and this caused, and or contributed to, the
> subject wreck.

*Id.* at 11.  The other seven opinions mostly track these two, but opinion eight adds that there is no

evidence of fault by any passenger or other vehicle.  *Id.*

Greyhound elects to keep things simple and does not parse Bundy's report.  As with

Pittman, Greyhound apparently accepts Bundy's expertise and his methodology and instead

asserts that its stipulation on proximate cause renders Bundy's opinions "irrelevant, cumulative," and not helpful to the trier of fact.  Def.'s Mem. [93] at 2.  Greyhound also says that there is nothing complex about how this accident happened, so Bundy's opinions would not assist the jury.  Def.'s Reply [108] at 4.  Finally, Greyhound notes that Bundy is not qualified to offer medical opinions.  *Id.*

The Court agrees to some extent.  To begin, Bundy would not be qualified to offer medical opinions related to injuries caused by the accident.  Also, at the liability phase, Bundy's opinions regarding Greyhound's alleged acts or omissions would be irrelevant and substantially more prejudicial than probative.  Fed. R. Evid. 401–403.

Beyond those holdings, the Court denies this motion without prejudice.  Much could happen between now and trial, but it presently appears that Nixon has not conceded liability.  So, as to the claims against her, the crash dynamics may still be an issue.  Indeed, it appears that she at least initially blamed the accident on the weather conditions.  *See* Allen Report [92-11] at 6.  Once her trial position is known, Greyhound may revisit this portion of the motion.

C.    Roger Allen

The bulk of the parties' briefing addresses opinions from Roger Allen, an expert in the transportation industry.  Like Pittman and Bundy, Greyhound accepts Allen's expertise and argues that its liability stipulation nullifies the need for the testimony.  Unlike the other two witnesses, Greyhound also argues that Allen's opinions are speculative and unreliable.

Turning to the substance of Allen's opinions, Plaintiffs summarize them as follows:

First, Mr. Allen opines that Greyhound and Ms. Nixon are required to exercise the highest degree of care and diligence for the safety of their passengers.  Second, Greyhound had several red flags based on Ms. Nixon's violations of policy and being on the high[-]risk list.  Third, Greyhound did not verify Ms. Nixon's previous employment and thus she was disqualified from driving a commercial vehicle.  Fourth, Greyhound violated its own practice by not having a supervisor

24

at the terminal prior to Ms. Nixon leaving with the bus full of passengers.  Fifth, Greyhound failed to use ordinary care based on Greyhound's actual awareness of the risk involved and acted with conscious indifference to the safety of others. Sixth, the Defendant failed in its monitoring of its drivers and this caused and/or contributed to Ms. Nixon's driving while intoxicated.  Seventh, Greyhound violated numerous federal regulations and the company's own policies and this caused and/or contributed to the wreck.  Eighth, Greyhound did not properly conduct drug and alcohol testing and ordered Ms. Nixon to violate the law.  In light of the above, Mr. Allen opines that Greyhound was negligent because it did not follow certain regulations and that Ms. Nixon was negligent because she was speeding, driving under the influence of alcohol, and driving in bad weather.  He states that the negligence, gross negligence, and recklessness of Greyhound caused or contributed to the subject crash.

Pls.' Mem. [104] at 9–10 (citations omitted).

These opinions mostly address Plaintiffs' claims against Greyhound; what Allen does say about Nixon is primarily a predicate for his Greyhound opinions.  *See* Pls.' Resp. [104] at 11 (describing the need for the testimony).  But to the extent his opinions do relate to Nixon's fault, Plaintiffs have not shown that they would be admissible.  The Court starts there because, absent admissible opinions regarding Nixon, Allen's opinions are not admissible during the liability phase.

For starters, the opinions regarding Nixon's fault would not "assist the trier of fact to understand the evidence."  Fed. R. Evid. 702.  "[E]xpert testimony does not assist where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic."  *Thomas v. City of Cedar Park*, No. A-07-CA-002-LY, 2008 WL 11416959, at *2 (W.D. Tex. June 3, 2008) (citation omitted).

Here, Allen first opines that Nixon caused the accident, yet even assuming Allen possessed the expertise to reconstruct an accident, he has not based his opinion on "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702(a).  He merely observes that she wrecked the bus because she was intoxicated, driving too fast, and her jacket may have obstructed her view.  Allen Report [92-11] at 25.  A lay jury does not need an expert to

"understand [this] evidence" and is equally capable of drawing those conclusions.  Fed. R. Evid. 702(a).

Allen also opines that Nixon's conduct violated Greyhound policy and applicable laws and regulations.  Allen Report [92-11] at 8–12.  But if the jury concludes that Nixon caused the accident because she was impaired, distracted, and speeding, it does not require an expert to explain that she violated company policies and applicable laws that prohibit speeding and driving while impaired or distracted.  *See J.S. v. Am. Inst. for Foreign Study, Inc.*, No. SA-12-CA-1036-XR, 2013 WL 5372531, at *9 (W.D. Tex. Sept. 24, 2013) (excluding expert testimony because jury was equally capable of reading company policies and determining from the evidence whether they had been violated).

Because this evidence regarding Nixon's fault is not admissible, and because Greyhound has accepted vicarious liability for Nixon's simple negligence, the Court agrees with Greyhound that his testimony would be unhelpful and inadmissible in the initial liability phase of the trial. But after that phase, the Court must consider Greyhound's alleged gross negligence during a section 11-1-65(1)(c) hearing.  And Allen's opinions could be relevant to that decision as well as during a punitive phase (if any).

Although the Court has invested considerable resources studying the briefs, the cited record evidence (and then some), and the applicable law, it requires clarification before deciding the extent—if any—to which Allen's opinions will be accepted during the section 11-1-65(1)(c) hearing or a subsequent punitive phase.  As noted before, the Court exercises "broad latitude both in deciding *how to determine* whether an expert's testimony is reliable, and ultimately, whether the testimony is, in fact, reliable."  *Kumho Tire Co.*, 526 U.S. at 142 (emphasis added).

For the parties' benefit, the Court has concerns regarding Allen's opinions that will need to be addressed.  While Allen is certainly qualified as an expert in this field, "without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987)).  Along these lines, when an expert says a defendant violated industry standards, the expert needs to identify those standards.  *See Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992) (affirming district court's exclusion of expert's subjective opinions unmoored to applicable standards).

For example, Allen says Greyhound should have monitored its drivers in real time using Drive Cams.  Allen Report [92-11] at 11.  Yet he cites no regulations or industry standards that would require such monitoring.  Similarly, he faults Greyhound for failing to have an on-premises supervisor at the terminal before Nixon departed.  *Id.*  Again, the Court could not find any reference to an applicable regulation or industry standard that Greyhound violated.

Similar questions exist regarding Allen's opinion that Greyhound failed to verify Nixon's previous employment.  It seems accepted that Greyhound used a third party to check prior employment, and that, in at least one instance, no response was received despite repeated requests.  Plaintiffs apparently rely on these facts to argue that "Greyhound began the hiring process by failing to follow federal regulations requiring it to confirm details of Defendant Nixon's previous employment."  Pls.' Resp. [104] at 12.

It is not clear whether Allen holds that same view.  His report suggests that Greyhound may have violated Federal Motor Carrier Safety Regulation (FMCSR) § 391.23, which he describes as follows:

> Under FMCSR § 391.23 Investigation and inquiries DOT Interpretations Question 2:  May motor carriers use third parties to ask State agencies for copies of the

> driving record of driver-applicants?  Yes.  Driver information services or companies acting as the motor carrier's agent may be used to contact State agencies.  However, the motor carrier is responsible for ensuring the information obtained is accurate.  Greyhound is ultimately responsible to verify previous employment and driving records.  I find Greyhound did not receive valid previous employment history.

Allen Report [92-11] at 7.  This language relates to inquiries to "State agencies" and does not mention former employers.  *Id.*  In addition, neither the parties nor Allen seem to address 49 C.F.R. § 391.23, which appears to require "good faith efforts" to contact previous employers.

Absent argument, the Court is reluctant to base a ruling on this code section.  And in any event, it is unclear from Allen's deposition testimony whether he believes Greyhound violated any regulations or industry standards by failing to verify Nixon's prior employment.  *See* Allen Dep. [92-12] at 95 (stating, when asked about Greyhound's efforts under applicable regulations, "[i]t's sufficient if they tried to contact" the previous employers, though noting he, himself, would "not . . . take that person's word for it" and would require verification).   After reading the back-and-forth in his deposition, it is not clear whether Allen ever clearly stated the basis for this and other opinions.  The Court wishes to explore those issues.

Finally, though the parties did not address it, Allen may not offer opinions like his conclusion that Greyhound was grossly negligent.  Allen Report [92-11] at 24.  Federal Rule of Evidence 704 states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  But the rule does not allow "the witness to tell the jury what result to reach . . . [or] give legal conclusions."  *Owen v. Kerr-McGee Corp.*, 698 F.2d

236, 240 (5th Cir. 1983).  The Court notes that the examples it has provided are just that, examples.  They are offered to help the parties frame the issues at trial.

In sum, Allen may not testify during the liability phase of the trial.  Nor may he offer opinions that reconstruct the accident, tell the jury what to find, or offer legal conclusions.  After the liability phase, the Court will hear from Allen and will determine the extent, if any, to which his opinions should be considered under section 11-1-65(1)(c), and, if necessary, during a punitive phase.

V.      Conclusion

The Court has considered all issues.  Those not directly addressed would not have changed the outcome.  Greyhound's motion for sanctions [85] is denied without prejudice; its summary-judgment motion [90] is granted in part and denied in part; and its motion to exclude [92] is granted in part and otherwise denied without prejudice.  The parties are instructed to contact the Court's courtroom deputy within ten days of this Order to set the case for a Zoom status conference during which pre-trial and trial dates will be discussed.

**SO ORDERED AND ADJUDGED** this the 13th day of September, 2021.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE